IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-02376-MSK-KLM

RALPH GAMBINA,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS,
RICHARD MADISON, Counselor, United States Penitentiary Administrative Maximum, sued in his official and individual capacities;
BLAKE DAVIS, Warden, United States Penitentiary Administrative Maximum, sued in his official and individual capacities;
MICHAEL NALLEY, Regional Director, North Central Region, Federal Bureau of Prisons, sued in his official and individual capacities;
HARRELL WATTS, Administrator, National Inmate Appeals, sued in his official and individual capacities,

      Defendants.

_____

OPINION AND ORDER GRANTING, IN PART,
MOTION FOR JUDGMENT ON THE PLEADINGS
_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for Judgment on the Pleadings (**# 21**); Mr. Gambina's response (**# 31**), and the Defendants' reply (**# 37**). Mr. Gambina has sought leave to file a surreply (**# 42**), which the Defendant oppose in part (**# 43**). The Court will grant Mr. Gambina's motion and consider his tendered surreply.

## FACTS

According to the Complaint (**# 1**), Mr. Gambina has been an inmate in the continuous custody of the Federal Bureau of Prisons ("BOP") since 1989. In 1992, Mr. Gambina was charged with attempted escape from his facility and was transferred to the BOP facility in

1

Marion, Illinois, where he was placed in solitary confinement.  Mr. Gambina proceeded to trial

on the escape charge and was acquitted by the jury.

The Complaint recites a series of allegedly retaliatory events by BOP staff that promptly

followed the acquittal, but the only event of significance to the instant matters is the fact that in

July 1993, Mr. Gambina was charged with a prison disciplinary infraction arising from precisely

the same conduct as the criminal escape charges against him.  A BOP Hearing Officer found

sufficient evidence to convict Mr. Gambina of the escape charges, notwithstanding the jury's

verdict, and recommended that Mr. Gambina be considered for placement within the Marion

facility's control unit.  A BOP administrator reviewed the Control Unit recommendation, but

found it unwarranted.  The Executive Review Panel reviewed the administrator's determination

and reversed it without comment, and in January 1994, sentenced Mr. Gambina to 60 months in

the Control Unit.

Upon the opening of the BOP's Administrative Maximum ("ADX") facility in Florence,

Colorado in or about 1995, Mr. Gambina was transferred to ADX.  Mr. Gambina was not

provided with any hearing prior to the decision to transfer him to ADX.  Mr. Gambina contends

that his incarceration at ADX is different from his incarceration at the Marion Control Unit in a

few respects.  In both facilities, Mr. Gambina was housed in a single-occupancy cell for 23 hours

a day, receiving a total of five hours per week of solitary exercise in a small, enclosed outdoor

area.  However, at ADX, he has a small television set in his cell, through which he may access

educational or religious programming.  He is routinely strip-searched each time he enters or

leaves his cell, whether for exercise, visitations, or any other reason.  He is provided two social

telephone calls per month and five non-contact visits with visitors.  He has no contact with other

2

inmates and limited contact with ADX staff.

Mr. Gambina completed the 60-month Control Unit assignment in September 2002.[1]  At that time, he was transferred to the Special Housing Unit at ADX, the confinement conditions of which are identical to those discussed above, with the exception that inmates in the Special Housing Unit do not have televisions in their cells.  In July 2003, Mr. Gambina was released to the "General Population" unit at ADX, but, despite the denomination, Mr. Gambina contends that the conditions of confinement in General Population are not materially different than those in the Control Unit.  In the ensuing years, Mr. Gambina was housed variously in the General Population at ADX and the Special Housing Unit, where he has been housed since mid-2008.

Mr. Gambina states that he "did not receive notice or a hearing prior to Defendants' decision to continue to incarcerate him at the ADX following completion of his Control Unit sentence."  He acknowledges, however, that in 2008, a policy change at the BOP entitled inmates to a hearing prior to placement in ADX, and that in July 2010, he retroactively was given a  hearing regarding this question.  He was given 4 days' notice to prepare for the hearing, which he participated in by telephone.  The Complaint does not reveal the results of this hearing; Mr. Gambina states merely that he "remains uncertain as to the purpose of the hearing."

Mr. Gambina has been told that in order to become eligible to transfer to another facility – and presumably, to a less-restrictive level of confinement – he must complete the ADX Step-Down program, a three-year program through which inmates progress through a series of less-

---

[1]According to Mr. Gambina, the 60-month period was extended due to '"BOP's failure to credit [him] for time served during which he declined to appear for monthly review hearings." His refusal to appear for the hearings was apparently based on his being involved in civil litigation against BOP officials.

restrictive housing units.  Mr. Gambina offers a conclusory assertion, without elaboration, that "the program is administered in an arbitrary and capricious manner," and notes that even successful completion of the program does not guarantee transfer to a different facility.  The issue appears to be moot however, as Mr. Gambina explains that he cannot participate in the program because several prison gangs have "a murder contract on [Mr. Gambina's] life."

Mr. Gambina asserts three causes of action: (i) a claim against the BOP under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, and against the individual Defendants under *Bivens*, alleging deprivation of a liberty interest, protected by the 5th Amendment, without procedural due process in that his "placement and continued confinement" at ADX was undertaken without notice or a hearing; (ii) a hybrid APA/*Bivens* claim that the conditions of Mr. Gambina's confinement amount to a violation of the 8th Amendment's protection against cruel and unusual punishment; (iii) a *Bivens* claim that Mr. Gambina's First Amendment rights to freedom of speech and right of access to the courts, insofar as the Defendants retaliated against him in various ways for taking the escape charges against him to trial in 1993, for successfully suing certain ADX guards for civil rights violations in 2006, and for making contact with his current counsel and initiating this lawsuit.

The Defendants move **(# 21)** for judgment on the pleadings in their favor.  Rather than recite the various arguments urged by the Defendants here, the Court will address them as appropriate in its analysis.


## ANALYSIS


4

## A.  Standard of review

Motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) are adjudicated under the same standards applicable to motions under Rule 12(b).  *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005).  The Court treats all well-pled factual allegations in the Complaint as true and considers them in the light most favorable to Mr. Gambina.  *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified what constitutes a "well-pleaded fact" for purposes of a Rule 12 analysis.  A pleader is not required to set forth "detailed factual allegations," but must offer more than "labels and conclusions," a "formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement."  *Iqbal*, 129 S.Ct. at 1949. The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including "legal conclusion[s] couched as a factual allegation."  *Id.* at 1949-50.

## B.  Personal Jurisdiction

The Defendants argue that this Court lacks personal jurisdiction over Defendant Nalley, Regional Director of the BOP's North Central Region, located in Kansas, and Defendant Watts, the BOP's Administrator for National Inmate Appeals, located in Washington, D.C.

The Complaint is somewhat vague in its particular allegations against Mr. Nalley and Mr. Watts.  In the recital of the various parties, Mr. Gambina offers the largely conclusory assertion that Mr. Nalley "has decisionmaking authority regarding transfer and placement of prisoners in prisons operated by the BOP, including ADX, and regarding the nature of confinement of

prisoners," without specifically describing the nature of that authority, and that Mr. Nalley "has had direct involvement in denying Mr. Gambina's prison-transfer requests," although the Complaint never clearly identifies the particular acts Mr. Nalley took to deny such requests. With regard to Mr. Watts, the Complaint alleges only that he "has had direct involvement in Mr. Gambina's appeals of the denial of his prison-transfer requests."

The narrative portion of the Complaint provides little additional detail. In some 67 paragraphs of substantive allegations, Mr. Nalley and Mr. Watts are specifically identified only four times: three times noting their capacity to review inmate grievances and their failure to grant relief to Mr. Gambina based on his grievances, *Docket # 1,* ¶ 44, 51, and 75, and once stating that "by virtue of their positions," they were aware of the nature of Mr. Gambina's confinement yet "failed to provide any meaningful review of Mr. Gambina's requests for transfer to a less restrictive environment."

Extended analysis of the personal jurisdiction question is unnecessary. The 10th Circuit has repeatedly held that the mere fact that individuals such as Mr. Nalley and Mr. Watts (sometimes <u>specifically</u> Mr. Nalley and Mr. Watts), residing in other states, review and deny inmate grievances for prisoners housed in Colorado is insufficient to render them subject to personal jurisdiction in Colorado. *Durham v. Hood,* 412 Fed.Appx. 127, 130 (10th Cir. 2011) (unpublished) ("The court similarly recognized that Watts and Hershberger's[2] contacts with Colorado were completely fortuitous to the extent Mr. Durham alleged [Mr. Watts was] involved in responding to his grievances"); *Whitington v. Ortiz,* 307 Fed.Appx. 179, 193-92 (10th Cir.

---

[2]Mr. Hershberger was Mr. Nalley's predecessor as Regional Director of the North Central Region.

2009) (unpublished) ("the denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations"), *quoting Larson v. Meek*, 240 Fed.Appx. 777 (10th Cir. 2007); *Hill v. Pugh*, 75 F. App'x 715, 719 (10th Cir. 2003) ("federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state").  To the extent that Mr. Gambina's allegations in the Complaint turn on Mr. Nalley and Mr. Watts' denial of his grievances, these cases alone make clear that no basis for personal jurisdiction exists.

In his response to the Defendants' motion, Mr. Gambina offers a different argument.  He contends that "Mr. Nalley has the discretion to either accept or reject a recommendation to place and to continue to hole Mr. Gambina in solitary confinement," that both men "authored and signed refusals to approve Mr. Gambina's prison-transfer requests," and that they "failed to meaningfully review the circumstances of Mr. Gambina's solitary confinement at the ADX."  However, the Complaint makes no such allegations.  The paragraphs of the Complaint cited by Mr. Gambina in support of this contention are the same ones quoted above; in each instance, the allegation in the Complaint is either nothing more than a conclusory assertion that Mr. Nalley or Mr. Watts have "decisionmaking authority" or "direct involvement" with Mr. Gambina's facility assignment, without identifying what that authority or involvement consists of, or an assertion that appears to indicate that the "authority" or "involvement" in question is a result of their having reviewed and denied Mr. Gambina's grievances.

The Court finds no well-pled facts in the Complaint that would indicate that Mr. Nalley or Mr. Watts' contacts with Colorado are anything other than the fortuitous result of Mr. Gambina being housed in a facility in Colorado.  Under these circumstances, the Court lacks

personal jurisdiction over Mr. Nalley and Mr. Watts, and the claims against them are dismissed.

### C. Statute of limitation

Next, the Defendants argue that Mr. Gambina's first and third claims for relief are barred by the statute of limitation. The Defendants construe Mr. Gambina's first claim seeking declaratory and injunctive relief relating to his 1995 transfer to ADX as arising under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, and is thus subject to a six-year statute of limitations. 28 U.S.C. § 2401(a). With regard to Mr. Gambina's *Bivens* claim for First Amendment retaliation, the Defendants contend that such claim is subject to a two-year statute of limitations, such that Mr. Gambina's claims that various acts retaliated against him for winning acquittal in is criminal trial in 1993 or in a civil claim in 2006 are untimely.

Mr. Gambina offers several arguments in response. First, he invokes the "continuing violations doctrine" for the proposition that the Court can "look backwards to the entirety of a continuing wrong to assess its cumulative effect, so long as an injurious act falls within the statute of limitations period. *Citing Burkley v. Corr. Healthcare Mgmt. of Okla.*, 141 Fed.Appx. 714, 176 (10th Cir. 2005). This Court disagrees. *Burkley* noted that "there is some dispute over whether the continuing violation doctrine applies with respect to § 1983 suits" by inmates but "assum[ed] without deciding" that the doctrine might apply, only to find that the inmate there had not demonstrated facts warranting its application. *Id.*

More recently, the court clarified the application of the doctrine to circumstances like those presented here. In *Fogle v. Slack*, 419 Fed.Appx. 860, 862 (10th Cir. 2011) (unpublished), the court considered the application of the doctrine to claims by a state inmate that his assignments to administrative segregation were undertaken without adequate due process

protections.  The court again acknowledged that it was not prepared to definitively rule whether

the doctrine applied in § 1983 cases, but it found that "each segregation decision was of a

discrete nature," such that application of the continuing violation doctrine was inappropriate.  *Id.*

at 864-65.  Cases from the District of Colorado have similarly found that inmate classification

decisions constitute discrete events, each subject to its own statute of limitations rather than a

"continuing" one.  *Matthews v. Wiley*, 744 F.Supp.2d 1159, 1169-70 (D. Colo. 2010) ("Mr.

Matthews' transfer to ADX in 1995 was clearly a single discrete event, the continuing violation

doctrine does not apply"); *Rezaq v. Nalley*, 2008 WL 5172363 (D.Colo. Dec. 10, 2008) (slip

op.).

        This Court's decision in *Georgacarakos v. Wiley*, 2008 WL 4216265 (D.Colo. Sept. 12,

2008) (slip op.), on which Mr. Gambina relies, is distinguishable.  There, the inmate alleged that

he was being held at ADX despite being eligible for assignment to a medium-security institution

based on his "classification score" under a BOP policy.  The BOP sought to dismiss that claim as

untimely, arguing that a classification score was calculated at the time the inmate was first

incarcerated and thus, any contention that he should not be held at ADX because of that

classification score was untimely.  This Court found that argument unpersuasive, noting that "it

is not clear whether the fixing of his classification level is a one-time event or how frequently his

eligibility for a less-secure classification is revisited."  *Id.* at \*12.  It went on to conclude that

the inmate could maintain a claim challenging the <u>present</u> calculation of his security level,

insofar as "every day he his improperly held at a more restrictive level" than is warranted under

BOP policies would constitute an actionable constitutional violation.  *Id.  Georgacarakos* must

be read in context: the Court was not finding that Mr. Georgacarakos could necessarily challenge

the propriety of a classification decision made many years ago; any doubt on that point may be resolved by examining the Court's analysis of the timeliness of the inmate's remaining claims, each of which examined whether the conduct being challenged was a discrete event in the past (such that the statute of limitations would begin running at the time of the event) or whether the conduct being challenged was a continuously-present condition of confinement (such that a challenge to those conditions would not be rendered untimely simply because the inmate had been exposed to those same conditions for a lengthy period of time without raising a challenge). Because the events challenged by the Defendants as untimely here are discrete events, *Georgacarakos* offers Mr. Gambina no relief.

Thus, although Mr. Gambina may timely challenge the procedural sufficiency of the July 2010 "retroactive" ADX assignment hearing, and may challenge the constitutionality of the conditions of confinement to which he is subjected, his challenge to the 1995 decision to transfer him to ADX is untimely. Similar reasoning compels the conclusion that his challenge to "retaliatory" acts occurring in 1993 and 2006 are untimely under a two-year *Bivens* limitations period. Each alleged act of retaliation was a discrete act with a readily-ascertainable date of occurrence, and thus, not suitable for application of the continuing violation doctrine. Accordingly, to the extent the first and third claims for relief seek to challenge events occurring outside the otherwise applicable statute of limitations, those claims are dismissed as untimely.

### D.  Due Process claim

Finally, the Defendants contend that each of Mr. Gambina's substantive claims fail to adequately state a cognizable claim for relief. Once again, the Court evaluates these claims by treating the well-pled allegations in the Complaint as true.

First, the Court turns to the Due Process claim.  This claim asserts that Mr. Gambina was denied procedural Due Process when BOP officials conducted a hearing in July 2010 to ascertain whether he should remain[3] in ADX.  The Defendants contend that Mr. Gambina fails to state a Due Process claim for two major reasons: (i) the conditions of his confinement do not pose an atypical and significant hardship, such that he has a constitutionally-protected liberty interest in avoiding assignment to ADX; and (ii) Mr. Gambina received all the procedural protections to which he was entitled.

To sufficiently plead a procedural Due Process claim, Mr. Gambina must adequately allege two elements: (i) that he was deprived of a constitutionally-protected liberty or property interest, and (ii) the procedures followed by the BOP in depriving him of that interest were constitutionally insufficient.  *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011).  Turning to the question of whether Mr. Gambina possesses a liberty interest in not being assigned to ADX, an inmate possesses a liberty interest in avoiding transfer to (or retention in) more adverse conditions of confinement only when those conditions represent an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Wilkinson v. Austin*, 545 U.S. 209, 221-23 (2005).

The Defendants argue that the 10th Circuit and the District of Colorado have determined that the conditions of confinement in ADX do not pose an atypical and significant hardship compared to conditions in other prisons, and that, as a matter of law, inmates at ADX do not possess a liberty interest in avoiding assignment to/retention in the facility.  The Court finds that

---

[3]The Complaint contends that the 2010 hearing was intended to retroactively determine whether Mr. Gambina should have been transferred to ADX back in 1995.

this argument unavailing for several reasons.  First, most of the cases cited by the Defendants were appeals from rulings on motions for summary judgment, where both parties were given the opportunity to fully address the broad panoply of restrictions and privileges that applied to the inmate in question.  *See e.g. Jordan v. Federal Bureau of Prisons*, 191 Fed.Appx. 639, 652 (10th Cir. 2006) (unpublished) ("prison officials provided substantial evidence inmates segregated in administrative maximum confinement experience restrictions and conditions comparable to those of general population inmates"); *Georgacarakos v. Wiley*, 2010 WL 1291833 at *11 (D.Colo. Mar. 30, 2010) (slip op.) ("[The BOP]'s affidavit describes in some detail the conditions of confinement experienced by the Plaintiff in the General Population unit of ADX").

In contrast,  the Defendants' motion arises under Rule 12, allowing the Court to consider only the allegations in the Complaint.  Without a full understanding of the particular conditions that apply to Mr. Gambina – from both Mr. Gambina and the BOP – the Court is reluctant to conclude that, as a matter of law, the conditions of his confinement can never give rise to a liberty interest.  These cases also demonstrate that, contrary to what one might expect, the conditions of confinement at ADX are not identical as to all inmates or over all periods of time, further highlighting the appropriateness of deferring thorough examination of the liberty interest question until discovery and a full factual record can be completed.

Moreover, the Court notes that the 10th Circuit has never squarely held that the conditions of confinement at ADX do not give rise to a liberty interest.  In *Jordan*, the inmate was housed at ADX for a period of four years during an investigation into his alleged role in a prison murder. 191 Fed.Appx. at 644.  Among the reasons that the 10th Circuit found his conditions not to implicate a liberty interest was the fact that "his confinement was not indefinite but instead

12

limited to the duration of the pending murder investigation." *Id.* at 652. The fact of the ongoing investigation weighed in the 10th Circuit's evaluation of the degree to which such conditions were "atypical," as "[i]t is not 'atypical' for a prisoner to be in segregation while his or her participation in violent conduct inside the prison wall is investigated." *Id.* at 653. By contrast, Mr. Gambina's tenure at ADX is not necessarily limited by the duration of a pending investigation; rather, it appears that Mr. Gambina will remain subject to confinement at ADX until either his sentence is complete or BOP officials invoke their discretion to transfer him to a less-restrictive environment. This Court cannot say, at this stage of the litigation, that the inquiry into whether Mr. Gambina experiences an atypical and significant hardship with regard to his circumstances will necessarily track the analysis of Mr. Jordan's conditions.

This is not to say that Mr. Gambina is likely to succeed on his Due Process claim. Since *Wilkinson* was decided in 2005, it does not appear that any circuit court has ever found that the conditions of confinement at the highest-security facilities rise to the "atypical and significant hardship" standard. *See generally Ajaj v. U.S.*, 294 Fed.Appx. 575, 586 (10th Cir. 2008) ("like the majority of our sister Courts of Appeal, we have never held the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest"); *Townsend v. Fuchs*, 522 F.3d 765, 772 (7th Cir. 2008) (explaining that "most solitary confinement facilities" present "ordinary incidents of prison life that inmates have no liberty interests in avoiding"). But the fact that Mr. Gambina faces difficult obstacles or long odds of success does not warrant dismissal of his claims; rather, the question of whether Mr. Gambina possesses a liberty interest in avoiding assignment to ADX is one that must await more complete factual development. Accordingly, the Court denies the Defendants' request to dismiss Mr. Gambina's Due Process

claims at this stage.

Second, the Defendants contend that the process provided to Mr. Gambina in conjunction with the July 2010 hearing (as described in the Complaint) was sufficient, as a matter of law, to satisfy Mr. Gambina's constitutional rights.  Extended discussion of this argument is unnecessary.  In *Wilkinson*, the Supreme Court addressed the types of procedural protections that would be sufficient before a prison official assigned an inmate to a "Supermax" facility like ADX.  The Complaint admits that Mr. Gambina was given some advance notice of the July 2010 hearing and was given an opportunity to state his position with regard to his proposed assignment/retention at ADX, two components that *Wilkinson* deems "among the most important procedural mechanisms." *Id.* at 226.  However, in *Wilkinson*, the Supreme Court noted that the state required that "the decisonmaker provide a short statement of reasons" justifying placement. *Id.* at 226.  Without expressly finding such a statement to be a requirement of procedural Due Process, the Court signaled a belief that such a statement "guards against arbitrary decisionmaking while also providing the inmate a basis for objection before the next decisionmaker or in a subsequent classification review." *Id.*  A reasonable reading of *Wilkinson* suggests that a statement of the reasons for approving ADX placement would be a necessary component of procedural Due Process. Mr. Gambina's Complaint implies that no decision was ever made, as Mr. Gambina "remains uncertain as to the purpose of the hearing."  Accordingly, the Court cannot say that, on the strength of the allegations in the Complaint alone, that the Defendants are entitled to dismissal of Mr. Gambina's procedural Due Process claim.

However, the Court agrees with the Defendants that they, as individuals, are entitled to qualified immunity on Mr. Gambina's claims for monetary damages against them.  A

14

government official sued for monetary damages is entitled to qualified immunity unless the plaintiff can show both that the official's actions violated a constitutional right and that the contours of that right were "clearly established" under existing law at the time of the deprivation. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).   With regard to a showing that each individual Defendant violated Mr. Gambina's constitutional rights, the Court notes that Mr. Gambina's Complaint makes no effort whatsoever to indicate which Defendant or Defendants personally participated in the conduct giving rise to the alleged Due Process deprivation.  It is not clear, for example, how Mr. Davis personally committed acts that deprived Mr. Gambina of his Due Process rights, nor whether Mr. Madison engaged in those same acts or different acts.  Mr. Gambina's Complaint appears to assume that all Defendants are equally responsible for having jointly engaged in all acts against him, even though the basis for that conclusion is unstated and, frankly, somewhat implausible.[4]  Although Mr. Gambina has alleged conduct that can reasonably be imputed to the Federal Bureau of Prisons, such that his Due Process claim may proceed to the extent it seeks injunctive relief, his failure to adequately allege non-conclusory facts showing the nature and extent of each individual Defendant's personal participation in the alleged unconstitutional conduct requires that those individual Defendants be granted qualified immunity.  *See e.g. Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996).  Mr. Gambina's Due Process claim will proceed against the BOP only, with injunctive relief the only remedy at issue.

### E.  Eighth Amendment claim

---

[4]The only specific individual mention the Complaint makes of Mr. Madison is that he "is responsible for assisting inmates . . . in resolving complaints and distributing mail and property." How Mr. Madison's pursuit of these tasks can lead to the conclusion that Mr. Madison deprived Mr. Gambina of Due Process by confining him to ADX without adequate procedural protections is a mystery.

The Defendants seek dismissal of Mr. Gambina's claim that his conditions of confinement violate the Eighth Amendment's ban on cruel and inhuman punishment. The Defendants contend, again, that the 10th Circuit has dispositively addressed this question in the context of ADX and found no such violation.

An inmate raising an Eighth Amendment challenge is required to make a two-part showing: (i) that the conditions of his confinement objectively "pose[ ] a substantial risk of serious harm" to his health, safety, or well-being, and (ii) that the Defendants were subjectively aware of this risk of harm yet manifested deliberate indifference to it. *Ajaj*, 293 Fed.Appx. at 578. The Court must examine the conditions of confinement "as a whole," mindful of the synergistic adverse effects that some conditions may have on one another, but it is but also recognized that "overall conditions [cannot] rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 583.

Mr. Gambina contends that various conditions at ADX combine to render his confinement unconstitutional. Among other things, ADX cells are small (87 square feet), and configured to minimize access to natural light and the ability of prisoners to communicate with one another. Inmates spend nearly all of their time in their cells, receiving only five hours of outdoor exercise per week, and that exercise takes place in enclosed, single-occupancy exercise areas approximately ten steps wide. Inmates are permitted to have two 15-minute social telephone calls per month and five non-contact social visits, although inmates are strip-searched before and after any social visit.

In *Ajaj*, the 10th Circuit addressed an ADX inmate's claim that his conditions of confinement – specifically, "limitations on his property rights, mail, access to telephones, and

recreation"; "lock-down for 23 hours per day in extreme isolation"; "imposition of discipline for

minor offenses"; "noise"; "lights which remain on in his cell 24 hours per day"; and "indefinite

confinement at ADX" – violated his Eighth Amendment rights.  293 Fed.Appx. at 582.

Affirming a grant of summary judgment to the BOP on Mr. Ajaj's Eighth Amendment claim, the

10th Circuit found that Mr. Ajaj could not demonstrate that the conditions of confinement

objectively posed a substantial risk to his safety or health.  The court explained that "save

Plaintiff's allegations regarding his access to exercise, the conditions of confinement he avers do

not, even taken together, constitute the sort of significant departure from the healthy habilitative

environment that the state is required to provide to its inmates."  *Id.*  (The Court went on to

conclude that a denial of any outdoor recreation for a full year "is not sufficiently serious to

implicate the Eighth Amendment."  *Id.* at 584.)

Mr. Gambina argues that cases such as *Ajaj* are not determinative of the Eighth

Amendment question because Mr. Ajaj did not raise, and the 10th Circuit did not consider, the

question of whether those conditions come to violate the Eighth Amendment once inmates are

exposed to them for lengthy periods of time.[5]  For example, in *Barney v. Pulsipher*, 143 F.3d

---

[5]Mr. Gambina also offers a highly-abbreviated alternative argument: a factor in the Eighth Amendment analysis is whether the conditions of confinement are "grossly disproportionate to the severity of the crime warranting punishment."  *Silverstein*, 704 F.Supp.2d at 1098, *citing Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996).  The Supreme Court has recognized that the Eighth Amendment can be implicated in "the rare case" where a comparison of "the gravity of the offense and the severity of the sentence" yield a gross disproportionality, *Graham v. Florida*, 130 S.Ct. 2011, 2021-22 (2010), but these cases are inapposite to Mr. Gambina's situation.  These cases – examining laws permitting juveniles to be sentenced to life without parole for non-violent crimes or "three-strikes" laws calling for lengthy prison terms for minor theft offenses – are of an entirely different quantum than Mr. Gambina's case, where he was initially incarcerated for armed bank robbery and two escape attempts, and his assignment to ADX was allegedly incident to a third attempted escape attempt (for which Mr. Gambina was acquitted of criminal charges but found guilty in a prison disciplinary proceeding

1299, 1312-13 (10th Cir. 1998), the court noted that "an important factor in determining whether conditions of confinement meet constitutional standards is the length of the incarceration." It explained that "a filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Id.*, citing *Hutto v. Finney*, 437 U.S. 678, 686-87 (1978); *see also DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) (noting that "the severity and duration of deprivations" work in inverse proportion).

The Court has some doubt that this argument is tenable. In the cases cited by Mr. Gambina, the length of incarceration was considered to determine whether the inmate suffered the conditions for too <u>brief</u> a length of time to constitute an Eighth Amendment violation. *Barney*, 143 F.3d at 1313 (inmates subjected to "a filthy cell, inadequate lighting and ventilation, lack of enclosures around the shower and toilet, unappetizing food, and no access to recreational facilities" for only two days did not amount to an Eight Amendment violation, as "far worse conditions fail to state a claim because of the brief nature of the incarceration"); *Craig v. Eberly*, 164 F.3d 490, 495 (10th Cir. 1998) (reversing grant of summary judgment because it was disputed whether inmate suffered exposure to an overcrowded and unsanitary cell and minimal exercise opportunities for a period of weeks or a period of months; "the difference between enduring harsh conditions for seven weeks versus six months may be constitutionally significant"). Here, there is no indication that the court in *Ajaj* found the conditions in ADX to

---

with a lesser standard of proof) and extended by Mr. Gambina's admitted refusal to appear at certain review hearings.

be constitutional by virtue of the fact that Mr. Ajaj's exposure to them was only brief.[6]  (Indeed, the "indefinite" nature of Mr. Ajaj's confinement at ADX was one of the conditions expressly recited by the court.)  Moreover, the Court has some doubt that the potentially-significant distinction between "seven weeks" and "six months" in *Craig* retains that potential significance when the difference is a period of "several years" for Mr. Ajaj and "many years" for Mr. Gambina.[7]

Nevertheless, the Court is reluctant to conclude that Mr. Gambina's allegations fail as a matter of law.  A close reading of *Ajaj* suggests that the primary human need focused on in that case was the lack of access to outdoor exercise.  The trial court found that although Mr. Ajaj "took issue with numerous conditions of confinement, his summary judgment response referenced record evidence only in regard to his limited ability to exercise outdoors and his indefinite confinement at ADX."  293 Fed.Appx. at 583.  In its ruling, the only issue the 10th

---

[6]The decision indicates that Mr. Ajaj had been at ADX since 2002, a period of six years at the time the decision was written.

[7]Arguably, *DeSpain* suggests that, because severity and duration work in "inverse proportion," a deprivation of minor seriousness suffered for an extremely long time might be actionable, but *DeSpain* never makes such an outright assertion.  However, *DeSpain* is somewhat coy about how this formula functions with regard to long-term deprivations.  Given the opportunity to juxtapose "substantial deprivations of shelter, food, drinking water and sanitation" that may be actionable under the Eighth Amendment "despite a shorter duration" with a less substantial deprivation that occurs for a long time, the court did not contemplate the latter. 264 F.3d at 974. Instead, it states the more obvious proposition that "minor deprivations suffered for short periods would not rise to an Eighth Amendment violation."  *Id.*  This would appear to be a calculated decision, as the logic of granting Eighth Amendment significance to a relatively minor deprivation of basic necessities simply because the deprivation occurred for an extremely long period of time is not necessarily sound.

In any event, *DeSpain*'s musings on this issue are dicta, as the serious nature of the inmate's deprivation there – a "lack of access to working toilets that led to his exposure to other inmates' urine and feces via the standing water" – overcame the relatively short 36-hour period of that exposure.

Circuit discussed in detail was access to exercise; the remainder of Mr. Ajaj's challenges were quickly swept aside in a single sentence.  *Id.*  By contrast, the primary human need underlying Mr. Gambina's claims here is the need for human interaction, as Mr. Gambina complains that the solitary nature of his confinement deprives him of "social contact, communications with others, meaningful physical exercise, and environmental and sensory stimulation."  He contends that "extreme sensory deprivation and social isolation" have "exacted a serious toll" on him over the 18 years he has been subjected to solitary confinement, first at Marion and now at ADX. Because Mr. Gambina's claim focuses on a different human need than the court examined in detail in *Ajaj*, this Court is reluctant to treat *Ajaj* as conclusive on Mr. Gambina's claim. Accordingly, the Court finds that Mr. Gambina has – albeit barely – alleged facts sufficient to satisfy the objective element of an Eighth Amendment claim.

The Court does not reach the second element of the claim – whether Mr. Gambina adequately alleged that any of the individual Defendants acted with a culpable state of mind – because the Court finds in any event that claims against the individual Defendants are barred by qualified immunity.  Mr. Gambina has not shown that an inmate's right to be free from the kinds of conditions of confinement existing at ADX – including long-term solitary confinement – is "clearly established" by Supreme Court or 10th Circuit precedent or the weight of precedent in other circuits.  *See Silverstein v. Federal Bureau of Prisons*, 704 F.Supp.2d 1077, 1098-99 (D.Colo. 2010) (granting qualified immunity to individual defendants on Eighth Amendment claim by ADX prisoner).  If anything, a case like *Ajaj*, which refused to find an Eighth Amendment violation despite allegations that the inmate was exposed to "extreme isolation" for a period of several years, suggests just the opposite.

20

Mr. Gambina argues that cases such as *Hutto v. Finney,* 437 U.S. 678, (1978), are

sufficient to clearly establish an Eighth Amendment violation in this circumstance, but *Hutto* is

patently distinguishable.  The Court need not explain how the facts of *Hutto* differ from those

alleged here; no reader will be particularly challenged to identify dozens of stark factual

distinctions between that case and this one.  437 U.S. at 682-83 & n. 3-6.  Moreover, although

*Hutto* does explore the Eighth Amendment question partially by exploring the circumstances

under which inmates were subjected to punitive isolation, and states that "punitive isolation . . .

may be [unconstitutional] depending on the duration of the confinement and the conditions

thereof," *id.* at 685-86, those observations have a starkly different meaning than Mr. Gambina

gives them.  It is clear from *Hutto* that the "isolation" being referenced is not <u>psychological</u>

isolation that results from an inmate having no meaningful human contact.  Just the opposite is

true: among the major problems in *Hutto* was that the "isolation cells" were <u>overcrowded</u>.  *Id.* at

684 ("The situation in the punitive isolation cells was particularly disturbing . . [t]here were

twice as many prisoners as beds in some cells. And because inmates in punitive isolation are

often violently antisocial, overcrowding led to persecution of the weaker prisoners").  In short,

the problem in *Hutto* was that solitary confinement wasn't solitary enough.  *Id.* (to remedy the

unconstitutional conditions, the trial court "entered an order that placed limits on the number of

men that could be confined in one cell, required that each have a bunk, . . . and set 30 days as the

maximum isolation sentence").  Passages in *Hutto* may sound like they lend support to Mr.

Gambina when extracted from the factual context of the case, but when these passages are read

and understood *in situ*, it is obvious that *Hutto* fails to "clearly establish" Mr. Gambina's right to

21

be free from long-term psychological isolation.[8]

Accordingly, although the Court will permit Mr. Gambina's Eighth Amendment claim to proceed against the BOP, giving rise to the possibility that he may ultimately obtain injunctive relief, the Court finds that *Bivens* claims for monetary relief against the individual Defendants are barred by the doctrine of qualified immunity, and those claims against Mr. Madison and Mr. Davis are dismissed.

### F. Retaliation claim

Mr. Gambina's final substantive claim is a contention that the Defendants retaliated

---

[8]The other case primarily relied upon by Mr. Gambina as "clearly establishing" the Eighth Amendment right to be free from psychological isolation is *Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988). Although *Davenport* contains the statement "[it] seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage," that statement is not apropos of anything in particular. *Id.* The issue in *Davenport* was prison officials' challenge to a remedial injunction that directed that inmates in solitary confinement for more than 90 days be given "opportunity to shower at least three times each week and to exercise outside of his cell at least five hours each week." *Id.* at 1311-12 ("All that the defendants are arguing is that the most the Constitution guarantees . . . is one hour of exercise outside the cell, and one shower, per week, and hence that the injunction is too severe").

The passage in which the court references "psychological damage" is of no apparent connection to the issues presented on appeal. Rather, it appears to be the court musing about why the prison officials did not also appeal a jury's verdict finding other conditions at the prison to be violative of the Eighth Amendment. *Id.* at 1312-13. Read in this context, the court appears to reach precisely the opposite conclusion than Mr. Gambina cites it for – it appears that the court believes that the psychological isolation resulting from lengthy solitary confinement falls within the typical incidents of prison life. After the sentence quoted above, the court goes on to state: "Of course, it is highly probable that the experience of being imprisoned inflicts psychological damage whether or not the prisoner is isolated, so it is only the marginal psychological damage from segregation that is relevant. And the infliction of disutility, to borrow a convenient economic term, is one of the objectives of criminal punishment; only if the only objective of punishment were incapacitation could it be argued that living conditions should be as comfortable in prison as outside." *Id.* at 1313. (The court goes on to express some concern that the jury's findings as to unconstitutional conditions warrants the challenged injunction, insofar as the unconstitutional conditions existed at a facility that was no longer open. *Id.*) Thus, taken in context, *Davenport* offers no additional support to Mr. Gambina.

against him for exercising his First Amendment rights.  As constrained by the Court's ruling

above with regard to the statute of limitations, this *Bivens* claim is limited to two instances

occurring in 2010.  Mr. Gambina alleges that, following his current counsel, "Defendants failed

to deliver several payments sent to Mr. Gambina by his brother."  Second, he alleges that

"following [his] continued interaction with undersigned counsel, Defendants retaliated against

Mr. Gambina by refusing to turn on the lights in Mr. Gambina's cell for at least two weeks in

September 2010."

       The Defendants raise several arguments as to why this claim should be dismissed, but the

Court need only address two related contentions: the Complaint's failure to allege facts showing

that any of the Defendants knew of Mr. Gambina's protected activities and the failure to allege

any particular Defendant's personal participation in the retaliation.  As noted above, the

Complaint generically alleges that "Defendants" did various acts, but the retaliation claim

necessarily presupposes that a particular Defendant or Defendant intercepted payments destined

for Mr. Gambina or refused to turn the lights off in his cell.  Mr. Gambina's response to the

Defendants' motion contends that because Mr. Gambina alleges that Mr. Madison "is

responsible for resolving inmate complaints and distributing mail," he "was at least partially

responsible for failing to deliver" the payments.  But this is nothing more than speculation – Mr.

Gambina does not allege that Mr. Madison is the only person that delivers mail, nor otherwise

explains why he would be "partially responsible" for someone else's failure to deliver the

payments.  (Mr. Gambina offers no argument whatsoever as to how any of the

Defendants were responsible for refusing to turn off his lights.)  Mr. Gambina's failure to

specifically identify the Defendant or Defendants that personally participated in this conduct

renders his retaliation claim insufficient. *Jenkins*, 81 F.3d at 994-95.

Moreover, by definition, where a person alleges that another has retaliated against them because of the person's prior protected activity, an essential element of the claim is that the person engaging in the retaliatory action must be shown to have had foreknowledge of that protected activity; the Defendants cannot have intended to retaliate against Mr. Gambina for an act that the Defendants were not aware had occurred. *See Titus v. Ahlm*, 297 Fed.Appx. 796, 801 (10th Cir. 2008) (unpublished). But the Complaint does not plead any facts explaining how Mr. Gambina has reached the conclusion that any Defendant knew of his communications with his counsel. Mr. Gambina offers only the speculation that because the Defendants are prison officials, "when an inmate . . . arranges a call with counsel, it is beyond debate that the BOP officials in question would know where the inmate is and what the inmate is doing." This is nothing more than sheer speculation (and illogically assumes that <u>all</u> prison officials are <u>always</u> aware of <u>all</u> communications <u>all</u> inmates have with attorneys). The failure to allege specific facts demonstrating each Defendant's particular knowledge of Mr. Gambina's protected activities requires dismissal of the retaliation claim.

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Judgment on the Pleadings **(# 21)** is **GRANTED IN PART** and **DENIED IN PART**. All claims against Defendants Nalley and Watts are **DISMISSED** for lack of personal jurisdiction. Mr. Gambina's first claim for relief, sounding in deprivation of procedural Due Process, and second claim for relief, sounding in violation of the Eighth Amendment, are **DISMISSED** as against Defendants Davis and Madison on the grounds of qualified immunity, but those claims shall remain extant against the BOP to

24

the extent they seek declaratory and injunctive relief.  Mr. Gambina's third claim for relief,

sounding in First Amendment retaliation, is **DISMISSED** in its entirety for failure to state a

cognizable claim.  The caption of this action is **AMENDED** to omit reference to Defendants

Nalley, Watts, Davis, and Madison, and will proceed solely against the Federal Bureau of

Prisons with regard to the Due Process and Eighth Amendment claims.

       Dated this 28th day of September, 2011

**BY THE COURT:**

Marcia S. Krieger
United States District Judge